BOYINGTON *versus* THE STATE.

After an indictment has been found against a prisoner, and the same has been filed and accepted in Court, he cannot except to the personal qualifications of the persons, selected, summoned and sworn on the grand jury, or plead in bar or avoidance of that indictment, that one of the jurors who preferred it is an alien.

Charles Boyington was indicted and found guilty, in the Circuit Court of Mobile county, for murder. On his arraignment, he plead in abatement of the indictment, that his name was Charles R. S. Boyington; on which issue having been taken, it was adjudged that he answer over to the felony. The prisoner then filed a special plea, averring that one of the grand jurors who preferred the bill of indictment against him, was, at the time of finding, an alien. The Court below, on motion, struck out the plea, but reserved the point as novel and difficult.

OLCOTT, for Prisoner—Contended, that the Court erred in striking out the plea in abatement, which alleged that one of the grand jurors who found a bill of indictment against the prisoner, was an alien. By the rules of Criminal Law, the prisoner must be convicted, if at all, upon the finding of two juries : first, by the grand jury, who determine upon the guilt, in one point of view ; and secondly, upon the finding of the petty jury, who establish that guilt in a more direct manner.

In that country from which our law is derived, as well as here, it is well settled, that the jurors upon either inquest, should be *probi et legales homines omni exceptione majoris.* This principle has ever been recognised in England, even in the darkest periods of her history, and the boast of Englishmen has ever

been, that neither their property or their lives could be wrested from them but by their peers. From the time of Conrad down, this principle has been considered as the great bulwark of life and property, and so has called forth the eulogiums of all commentators upon her laws. *Blackstone*, in the 3d vol. of his *Commentaries*, (351,) says—" that the jury is to consist of twenty four of the best men in the county who are called the grand jury." "Those returned to serve on the grand jury, must be *probi et legales homines*, and ought to be of the same county where the crime was committed; and therefore, it is a good exception at *Common Law*, to one returned on a grand jury, that he is an alien, or villain, or that he is outlawed for a crime."—3 *Bac.* 725—*Cro. Eliz.* 654—3 *Just.* 30— 12 *Coke*, 99—2 *Rollin*, 82—2 *Hale's P. C.* 154, 155. " Aliens born cannot be returned of juries," (7 *Coke* 18.) As he says, in *Robert Scarlet's* case, 12 *Coke* 99, before referred to—" as was used in the time of his noble progenitors, which was in affirmance of the Common Law." And I believe it will hardly be contended, that it would not have been good cause for challenge, should either of the jurors have been an alien. This is abundantly settled in 6 *Johns. Rep.* 333, *Borst* vs. *Beecker*—1 *Cowen*, 436, and cases there cited. It would seem too, from the very character of a grand juror, as given us in *Blackstone* and in *Bacon*, that it must ever have been considered, that no alien could legally find a place upon a seat so respectable and so responsible as a grand juror's seat—the grand inquest of the county—the peculiar guardians of the lives and liberties of the subject; for no man can be tried until this jury have found good cause for that trial, and so represented to the Court. Why has the learned and eloquent commentator upon the laws of England, given us such a high eulogium upon

trials by jury, and particularly dwelt on the right of being accused and tried by one's peers, if he had not deemed it an invaluable privilege? Is it mere verbiage—words *vox et præterea nihil*—or was there just occasion for such language? It certainly is of the utmost importance that none but *"boni et legales homines,"* should ever become grand jurors—men who would feel the responsibility of their station—men who would prefer no charges against a fellow citizen, where the law and the evidence did not compel them. Were it otherwise, how great the mischiefs which might arise: for now, as in the days of Lord *Coke*, men of high standing, and of character untarnished, might be accused for purposes of profit and advantage, or to gratify the revenge of the accuser; and it is of great consequence, that men acquainted with our laws and our institutions, should be selected for grand jurors, that they might be enabled to act understandingly upon any charges which might be brought against any individual. This will be seen from a single illustration. A man is charged with high treason: some of the jury are Spaniards—some Chinese, and the remainder are Americans. Can those who compose that panel—some ignorant of laws, and even of our language, be fit men for weighing the evidence, and applying it to the law which would govern in such a case? Most certainly not. A man is accused of murder—an idiot is found to have a seat upon the grand inquest—would it be competent for such a panel to affix that odious accusation upon a citizen? Most clearly not. These, and other illustrations would readily occur to the Court, and I need cite no other cases.

But, it may be argued, that the grand jury are merely accusers, and that the guilt is not fixed by their verdict, and so no injury would happen to the

accused. Is this so? Is it no injury to a man of irre-
proachable character, to be accused by a grand jury
of an odious offence? Is not the accusation written
upon the records of the Court? And is he not compel-
ed to defend his character, and to appear in the light
of a felon? I apprehend that the law is not so impo-
tent, that he would be forced to answer to a charge,
unless that charge should be preferred by his equals—
men of integrity, of intelligence, and who felt their
responsibility. I think the Court are satisfied of the
great importance that our grand jurors should be men
free from all exception, and that I waste words in far-
ther discussing this point.

We come then to the second and main point in the
argument—if there is a remedy, where the panel is
not made up of "good and legal men," can it be had
by a plea in abatement? A careful review of all the
authorities, and a consideration of the only opportu-
nity which may sometimes be afforded the prisoner
to make the objection, will, I apprehend, lead the
mind to the adoption of the affirmative of this ques-
tion. It has been argued, that all the decisions upon
the question, whether alienage might be pleaded in
avoidance of an indictment, have been founded upon
the statute of 11 Henry IV; and as that statute has
not been adopted in this state, those decisions would
not be deemed authority here. The decisions made
at the time, or for a century after, scarcely allude to
the act of Henry IV, and so far from it, the cases re-
fer to decisions made previous to that statute. As
great stress has been laid upon a passage in *Hawkins*,
and as it is supposed that his remarks settle the ques-
tion, as being the oldest authority upon the subject,
whether alienage or outlawry could be pleaded in
avoidance of an indictment, it will be important to
give to that passage a careful consideration.

That passage will be found in 2 *Hawkins* 296, *sec.* 18. Upon the reading of that section, and the clause in which he says, "it seems to be the general opinion that this resolution was rather grounded upon the statute of Henry IV, c. 9, which was made in the same term in which this resolution was given, than on the Common Law : but it appears from this very same year book, that when this plea was first proposed, it was disallowed, from whence, as I suppose, it is collected, that the subsequent resolution was founded on the authority of the said statute, which may be intended to have been made after the plea was disallowed, and before the subsequent resolution was adjudged good. Yet, considering that the said resolution was given in the beginning of Hilary term, and that the Parliament which made the said statute was not holden before the beginning of the same term, and *therefore it is not likely that the statute was so soon made*, and also considering that the said resolution was given by the advice of all the Judges, who seem to have been consulted about the validity of the plea above mentioned at the Common Law, and *takes no manner of notice of any statute, but only of the law in general*, it may deserve a question, whether such plea be not good at the Common Law." Now, I contend but for the clause in which he says "it was the general opinion," &c.—the whole scope of the reasoning brings the mind to the conclusion, that the plea was adjudged good upon the Common Law. He cites to this "general opinion," 12 *Coke*, 99—3 *Co. Inst.* 30—*Crown Cas.* 134. I have examined with some care, the decisions referred to, and cannot perceive that they sustain that opinion. The case cited from 12 *Coke*, is *Robert Scarlet's* case. He was indicted for procuring himself to be summoned of the grand inquest, with intent to indict his neighbors ma-

liciously; and the only question in that case, was, whether he could be punished under that statute. The plea was, not guilty. It will be perceived, that this case does not touch the question, whether alienage might be pleaded in avoidance, and does not, of course, give any opinion, that alienage could not be pleaded by the Common Law, in avoidance of an indictment: and the page referred to, in *Coke's Institutes*, merely says, for what cause a juror may be challenged, to which reference has been made in the argument. And, the other case referred to, is *Calvin's*, (7 *Coke's Rep.* 18)—and the point was, whether an alien might bring a suit in the Courts of England; and the plea there was, that the plaintiff ought not to be answered, because he was an alien born; and for divers reasons, among which are, "for that aliens born cannot be returned of juries for the trial of issues between the King and the subject." But the point, whether alienage or outlawry would be a good plea in bar or avoidance of an indictment, did not arise; and a case in *Cro. Car.* 134, (*Sir Wm. Withipole's* case,) would seem to show, that the plea referred to by *Hawkins*, must have been made upon the Common Law, which will appear from a reference to the case. He was indicted for the murder of Magason, and pleaded that two of the grand jurors were outlawed, which plea was founded on the statute of Henry IV, above mentioned; and the Court say, "because *this was the first plea that had been upon the statutes*, and would be a precedent in Crown matters, the Court would advise." The plea was sustained. So, in *Croke's Eliz.* 751, (*Hammond* vs. *The Queen*)—*Gawdy*, who appeared as counsel, objected that the jurors were not said to be *pro borum et legalium hominum*, and referred to the Year Book, to which *Hawkins* refers, and says nothing of the statute. From these references, and

from an examination of the section by *Hawkins*, I think the Court will be perfectly satisfied that the plea in avoidance was grounded, not upon the statute of Henry, but upon the Common Law. The twelve Judges had been convened for the purpose of deciding upon a point—that is, upon the plea, which had been previously proposed and disallowed. The former opinion, of course, had been made upon the Common Law, for it was then some time before the passing of the statute, or the sitting of Parliament, as the decision after was made at the beginning of Hilary term, and that the Parliament which made the same statute was not holden before the beginning of the same term; and as I shall shew from a case reported in *Curran's Speeches*, page 275, in the trial of the *Shearers*, that that statute did not receive the royal assent until the fifteenth day of Hilary term. Now, is it not a most fair presumption, an almost irresistible inference, that, called as the Judges were, to decide upon a plea at *Common Law*, (for it will be borne in mind that the statute had not then been passed,) and to overrule a decision which had been previously made, that as they made no mention of, or allusion to the statute—that the time of making the second resolution or decision, was previous to that when this statute received the royal sanction. And will not a reference to all Reports show, that the Judges themselves would have saved themselves the trouble of deciding a difficult point of Common Law, when a statute had been passed directly upon that law. If the statute had been passed, and the decision was founded upon that statute, they might have said, and undoubtedly would have said, in the language used by all Judges, early and modern, that as Parliament had passed a law upon the subject, they were only to expound and declare that law. It was

not statute law which they were called upon to decide, but upon a point growing out of the Common Law, and as the previous decision had been made upon the Common Law, the latter most clearly went upon the same in overruling the former, as no reference was made in the decision to the statute. The Judges could have taken no time to consider the statute, as will appear from a reference to the authorities cited from *Hawkins* and *Curran*, as to the time of the decision and passing of the law; and would they have decided upon the statute without taking any time for consideration, more particularly when that statute was in direct conflict with a previous decision. Furthermore, Parliament would not have passed a law, without, at the same time, providing a remedy, except upon the knowledge that a remedy existed at Common Law. No remedy was provided by the statute of Henry, and it is a fair and legitimate conclusion, that the resolution of the twelve Judges was made antecedently to the passage of the statute, and this statute being merely affirmative of the Common Law, and the remedy upon the Common Law being settled, it would have been superfluous to have created one.

I beg the Court, once more, to examine the reasoning employed by *Hawkins*, in the passage cited, and see if it is not evident that his mind inclined to the belief that the plea was adjudged good at Common Law, but for the cases which he supposed made the contrary opinion the prevailing one. It is said in 3 *Bacon's Abr.* 725, "that the exceptions to a jury must be taken before the indictment found," and cites the authorities from *Coke's Inst.* and *Coke's Rep.* which I have examined: but all the decisions of later times, as well as *Bacon*, refer to the decision of *Hawkins*, as settling the question, and unless I have entirely mis-

apprehended that author, he does not decide that the plea would have been bad at Common Law. Even in the dark and gloomy period of Ireland, when the blood of her choicest sons flowed like water, to allay the fears of an arbitrary and jealous despotism, when the Judge was appointed for the sole purpose of sacrificing, under the sacred name of law, and under its forms, him, who had made himself obnoxious to the tyrant, by daring to sigh for the blessings of a well regulated liberty—even then, pliant as was the Judge, the Court was inclined to believe that the plea might be good at Common Law; and gives the reasons, and puts the decision of the cause upon what was supposed were tenable grounds : And Lord *Carleton* says, " From a manuscript note which I have made in my *Hawkins*, I perceive the statute received the royal assent in ———— *Hilarii*, which was on the 27th or 28th of January, and might, perhaps, have preceded the decision referred to by *Hawkins*." He also " supposes, that the decision in *Hawkins*, gave the prisoners a right of pleading." One consideration more upon the passage in *Hawkins*, and I have done with it. The Court will bear in mind, that the decision was made early in the session of Parliament, and probably before the passing of the law. This decision, that the plea was disallowed, *Hawkins* says was made in the same Year Book of 11 *Henry IV.* It was probably decided at the assizes by one of the Judges, where I think all criminal cases were tried, and the point being a difficult one, was reserved for the opinion of the twelve Judges. Now even admitting, for the sake of the argument, that the statute had been passed, still, the question having arisen before it was passed, the Judges could not have considered it, because the statute would have had a retrospective effect. Suppose, since the decision of the Judge below, striking out

the pleas, the Legislature had passed a general act, that all pleas in avoidance of an indictment that one of the grand jurors was an alien, should be good and available—not relating back to previous proceedings, would this Court have considered that act in settling a case which had arisen previous to the passage of that act? Most certainly not. It would seem that the doctrine in *Hawkins* cannot be made to weigh against the position I have attempted to maintain.

A remark of Lord *Bacon* is relied upon by those opposed to the plea, as decisive against it. He says, in his *Abridgment*, page 725, "*It is said*, that these exceptions must be taken before indictment found;" and he refers to *Cro. Ca.* 134, 147—3 *Inst.* 32—12 *Coke* 99—2 *Hale's P. C.*—all which authorities have before been examined, and none of the authorities sustain that position; and as his remark is bottomed upon the authorities which he cites, it will not hold good, unless sustained by them. I have now examined all the authorities in the older books, which are relied upon by those who object to this plea. A case in 9 *Mass. Rep.* (*The Commonwealth* vs. *Smith*,) is cited as an authority against the plea. But for an *obiter dictum* of the Judge who gave the opinion, which *dictum* has since been overruled in the same Court, it could not avail as an authority against the plea. The prisoner was indicted for corruptly taking and receiving usurious interest, and one Thomas Wing, a Quaker, did not take the oath prescribed by the statute. There was no objection to him on any other ground: there was no question he was *bonus et legales homo*. *Sewall*, Judge, says—"objections to the personal qualifications of the jurors, or to the legality of the returns, are to be made before the indictment is found." He goes on to say—"But without resting upon this, and admitting the defendant to have the

full benefit of the exception, if it ought to avail him, or if the impannelling of the grand jury, under the direction of the Court, was, in point of law, liable to the objection now stated;" and then goes on to decide the case upon another point. So, it will be perceived, that the Judge himself did not rely upon that *dictum*—the case did not turn upon it—and, according to a well established rule, recognised by the Supreme Court of the United States, in *Sturges* vs. *Crowning-shield,* that the positive authority of a decision is co-extensive only with the facts on which it is made.—4 *Wheaton's Rep.* 122—*Ogden* vs. *Saunders,* 333. This being merely a *dictum* of the Judge, and not relied upon as settling the case, and not presenting the same facts which this case does, is not a positive authority. But, the Court will perceive, that this same case is overruled in *Commonwealth* vs. *Parker & al.* The Chief Justice says—" The books say that grand jurors also may be challenged : but there is a difficulty in the case, for a bill may be found against a person who has not been recognised to appear, and who has no opportunity to challenge. The case of *The Commonwealth* vs. *Smith,* 9 *Mass. Rep.*—if we should adopt the remarks there made on this subject, to their full extent, would put an end to this motion in arrest. It is there said, that objections to the personal qualifications of the grand jurors, or to the legality of the returns, are to be made before the indictment is found. It is not necessary to apply the remark here, and we have some doubts as to the correctness of it in all cases; and the case in which it was made, was determined upon another point."—2 *Pick. Rep.* 563.

I think I have established the position, that the plea was good at Common Law, and have met the authorities which have been presented against it, and that the Court will be satisfied that the law guaran-

tees to every citizen the right of being accused as well as tried by his peers—by good and lawful men—by men free from every exception. And the Court will perceive, that cases may and do frequently arise, that if the objection to the personal qualifications of a juror may not be made after indictment found, the right would be of no avail to the accused. For it frequently happens that a bill may be found against a person who has not been recognised to appear at the Court, and of course he could make no challenge; or that he was in prison loaded with shackles, and ignorant of all proceedings against him. Now, it would be a mockery in either of these cases, to say to the individual, you have the right guaranteed to you to be accused and tried by your peers, but because the bill is found, though you had no opportunity to appear, you are too late to object that some of the jurors are outlawed—some aliens, and otherwise disqualified. It would seem that the law is not chargeable with such an absurdity.

It has been supposed even if an alien might not legally set upon the grand inquest, still, that we could not get behind the indictment to make the objection: but the contrary doctrine is settled in 2 *Gallison's Reports*, 364.

On the authorities which I have quoted, and from the great favor which is shewn to the accused in *favorum vitæ*, I feel a strong confidence that the judgment of the Court below will be arrested.

BREEDIN, *Solicitor.*—The first question here, is, whether these two pleas, if they might at any time be legally pleaded, ought not to have been filed before the first plea in abatement was submitted to the jury. Suppose them, for argument sake, to be allowable by the rules of the Common Law, many other matters,

then, may be pleaded in the same way; and if the accused be permitted to plead and try them, one at a time, for two several days, there is nothing to restrain him from filing and trying one at a time, for a series of days, until the whole term of the Court be exhausted, in the disposition of his collateral issues. Nor could he be restrained from employing succeeding terms of the Court in like manner; while there yet remained any matter to be embraced in a plea.

This is not the only, or principal ground, however, upon which the pleas were disallowed. The first plea sets forth, that George Davis, jr. one of the grand jury that found the indictment, was not, at the time of such finding, a citizen of the United States—but, on the contrary, was a natural born subject of the King of Great Britain, and had never been naturalized. And the other, sets forth, that Chandler Waldo, also of the grand jury that found the indictment, had, before he was sworn, formed and expressed an opinion as to the guilt or innocence of the prisoner. These exceptions, as to the qualifications of grand jurors, it is thought, cannot be legally taken after indictment found. If they can, it must be by virtue of some statute, or by the rules of the Common Law— *Hawkins* (Book 2, chap. 25, sec. 18,) says, " It is resolved in the Year Book of 11th Henry IV, by the advice of all the Justices, that one outlawed on an indictment of felony, may plead in avoidance of it, that one of the indictors was outlawed for felony." " But," he continues, " it seems to be the general opinion, that this resolution is rather grounded on the statute of 11th Henry IV ;" and after some reasoning, he concludes by saying, " it deserves a question whether it be good at Common Law." From the phraseology of this latter clause of the section, it is evident that the question was not equally balanced in the au-

thors mind.   The plea is good, or it is not good.—
Now, if it barely deserve a question whether it be
good, the balance between the plea and the doubt,
would be, evidently, in favor of the plea.   But the
question is, whether it be *not* good at Common Law:
assuming that it is not good, and applying the doubt
in this shape, "it may deserve a question," &c.
There may seem a little too much refinement in this
criticism: but when it is considered that this is the
only authority that has any leaning in favor of these
pleas, and that the books on criminal law, as will be
presently shewn, allow them, not by force of the Com-
mon Law, but by virtue of the statute of 11th Henry
IV, it is important that the doubt or "question" should
have its proper application.

By the statute of Westminster 2d, it was enacted,
that old men above the age of seventy years—persons,
perpetually sick, or infirm at the time of summons,
or *not dwelling in the county*, should not be put in ju-
ries or lesser assizes.   Yet, it was never held unlaw-
ful for any such persons to sit on grand juries, if they
thought fit—*Hawkins*, book 2, chap. 25, sec. 20.

The statute of 28th Edward I, required sheriffs to
empanel such as were ordained by statute—next neigh-
bors and least suspicious; and it provided punish-
ments for infractions thereof.   And the statute of 23d
Edward III, required all panels to be made of the
next people, which should not be subject or procured.
But it cannot be shewn, nor does it any where ap-
pear, that when any of the provisions of these sta-
tutes had been neglected or omitted, indictments could
be abated or avoided, in consequence of such neglect
or omission.

The principal statute, however, is that of 11 Hen-
ry IV.   Its preamble recites, "that now of late, in-
quests were taken at Westminster, of persons named

to the justice, without due return of the sheriff; of which persons, some were outlawed before the said justices of record, and some fled to sanctuary for treason, and some for felony, there to have refuge ; by whom, as well many offenders were indicted, as other lawful liege people of our Lord the King, not guilty, by conspiracy, abetment and false imagination of other persons, for their special advantage, and singular lucre ; against the course of the Common Law used and accustomed before this time." It was therefore enacted, " that the same indictment so made with all the dependence thereof, be revoked, annulled, void, and holden for none forever." Here, then, is the authority under which pleas in abatement or avoidance of an indictment were maintainable. An indictment is, to all intents and purposes, a record of a Court; and at Common Law no record can be questioned or controverted by a plea. It sets forth that the indicters are good and lawful men, because they have undergone the legal tests that authorise this part of the record. And although the caption of the indictment itself might not show them to be good and lawful men, yet it has always, in England, been sufficient, if it could be shown by the other parts of the record: and it certainly does, as it did in England, require the force of a statute to disturb that record. We have no such statute.

That there had been great abuses of the Common Law in England, in this particular, it is evident from the preamble to the statute of 11th Henry IV. Persons had sat upon inquests without due return of the sheriffs—some had fled to sanctuary for treason and felony : yet, for these Common Law disqualifications, it was no where pretended that a plea in abatement, or in avoidance of an indictment found under them, was good ; nor has any been sustained, that is not ex-

pressly said to be by force of the statute of 11th Henry IV. It is true that there is nothing contained in the statute which disqualifies an alien; but it may be admitted that if either of the exceptions embraced in the statute, can be pleaded at Common Law, so can any matter impugning the Common Law qualifications of grand jurors be pleaded also.

"Those returned to serve on grand juries, must be *probi et legales homines,* and ought to be of the same county where the crime was committed; and therefore, it is a good exception at *Common Law,* to one *returned* on the grand jury, that he is an *alien,* a villain, or that he is outlawed for a crime, or that he was not returned by the proper officer, or that he was returned at the instance of the prosecutor; *but these exceptions must be taken before indictment found."—Bac. Abr.* (Juries A.)

Then, if the qualification of grand jurors are not to be questioned and controverted by pleas, after indictment found, at what time are they to be questioned? It is at the time they are to be sworn. The Court will interpose, upon its own knowledge of exceptions, or, upon suggestion. Every person in the community has a right to be heard touching exceptions, because each member of the community is, at least, liable to an accusation. The action of grand juries, in practice, is not limited to enquiries about offences actually committed, or of individuals actually guilty: by possibility they may accuse wrongfully; and the right, secured by the Common Law, to take exceptions before they are sworn and the record made up, is for the protection of the innocent; and not, by a perverted and incongruous system of pleading, for the advantage of the guilty. There is no rule better settled, than, if an indictment omit to state that it is found by good and lawful men, and that the omis-

sion cannot be supplied by the other parts of the record—that it is insufficient. Are the words, good and lawful men, then a mere mockery; or, are they significant of the judgment, in that particular, of a competent Court? It should seem that the Court, having allowed all the scrutiny authorised by law, had rendered its judgment, that the grand jurors were good and lawful men, and that nothing short of a positive statute could disturb that judgment.

'The statute of Westminster the 2d, and every succeeding statute, down to that of 11th Henry the 4th, appears to be an effort to reach abuses, which might have been pleaded in abatement or in avoidance of indictments, if such pleas had been allowed by the Common Law. And yet it does not appear that any attempt to plead them, had ever been made, until just before the time at which the last mentioned statute was enacted; when the plea was disallowed. Nor was it afterwards allowed, until, by strong probability, the statute became in force. At least, all the authorities credit the allowance of the pleas to the statute itself.—2 *Hawkins, chap.* 25, *sec.* 33—*Bacon, folio ed.* 234—1 *Chitty* 252.

The statute of 3d Henry the 8th, provides for reforming the panel, very much in the manner of the Alabama act of 1826; and it was resolved by the twelve Judges in England, that indictments might be avoided in the same manner as before, by force of the statute of 11th Henry the 4th, except the nomination be made by the Justices, authorised by 3d Henry the 8th, to reform the panel. Now, if the statutes be alike in their provisions, and the record here shows that the panel was reformed under the act of 1826, unless the resolution of the English Judges be erroneous, the reform of the panel here is conclusive, that the jurors were good and lawful men.

It is sometimes urged that, at Common Law, grand jurors were required to be of good and lawful men ; and that the statute of 11th Henry the 4th, was but in affirmance of the rule.    This is conceded—except so far as the statute provides that indictments found contrary to its provisions *shall be void.*    This part of the statute is certainly not declaratory of the Common Law: for indictments could only be declared void on pleas ; and it has no where been allowed, at Common Law, that a record could be controverted in that manner.    Such was the principle of the decision in the case of *The Commonwealth* vs. *Smith,*— (*9th Mas. Rep.* 107,) and such, too, is believed to have been the principle which actuated Chief Justice *Marshall,* in the trial of Aaron Burr, when he said " this. is the time" (before they were sworn,) " when the accused has a right to take exceptions to the grand jurors."

Then, it may be asked, how can effect be given to the Common Law, of which, the other parts of the statute are but declaratory.    The answer is plain. The laws have imposed on the tribunals of the country, and the officers of justice, an obligation to select for jurors none but good and lawful men; and if that be omitted or disregarded, there is no less an obligation on the Court, upon its own knowledge of exceptions, or upon suggestions of them from any quarter, to purify the grand inquest from all obstacles to a free, impartial, and legal administration of public justice. These suggestions of exceptions, before, or at the time the jurors are about to be sworn, may come from any person, since every person is liable to the animadversion of the grand jury.   It should be remembered too, that the proceedings before that body are but *ex parte* preparations—mere accusations, and constitute in themselves no part of a trial whatever.

If exceptions might be taken after indictment found, it would become the policy of the guilty to look and be silent when they saw exceptionable persons about to be empanelled and sworn. They cannot be known to the presiding Judge, or the officers of Court, by intuition ; and guilty persons knowing them, would reserve their disclosures until after indictment found, that they might have other chances of more favorable returns; or of taking similar exceptions *ad infinitum.*

All persons, whether previously accused before examining magistrates, or not, stand precisely on the same footing before the grand jury and the laws. There is no distinction to be found in the books, between such as have been imprisoned for trial, recognised, &c. and such as never had been accused or suspected of crime, until complaint made to the grand jury. There are no privileges extended to the one, that may not be legally claimed by the other. And since all are liable to indictment, each has the right to take exceptions to the qualifications of the indictors: before indictment found, but not afterwards.

Any other rule, without further legislation, would render the criminal code a mere mockery. The sheriff of a county, in obedience to his duty, makes his biennial return of the householders and freeholders of his county : The Judge of the County Court, the Commissioners of Revenue, the Sheriff, and the Clerk of the Circuit Court, reform the panel, and select such as are qualified to serve on juries. The Judge of the County Court, the Sheriff and the Clerk of the Circuit Court then draw the jury—they are summoned and returned, and in open Court, in presence of the whole assembled community, the grand jurors are selected from the entire panel by lot. A stranger Judge presides—he knows nothing of exceptions, nor do the

officers of Court; but the guilty, sit by—perceive exceptions, and refuse to disclose them. The grand jury is sworn and charged; and the record, that they are good and lawful men, is made up. An indictment is found, and the accused pleads that one of the jury was born in England, and was never naturalised. The Court directs the prosecutor to take issue, and it is found for the accused. Here is, not only the end of that accusation, but, an end to every criminal procedure for the whole term; for it would be idle to suppose that any other person accused would forego his right to the same exception—since, in taking it, without touching the merits of his case, he would be certain of a triumph. Or, can the Court empanel a new grand jury; or supply the places of those, against whom the exceptions were taken, after the record is made up? It does not so appear, either by statute, or by the common law. So that in taking and maintaining an exception, which could, by possibility, only be known to him, it would allow one guilty person, or one accused of crime, at the very threshold of a term of the Court, to subvert the public justice of the country.

Having shewn, then, as I humbly conceive, that the Court below did not err, in ordering the two pleas to be stricken out—first, because they were not pleaded at the proper time; secondly, that pleas in abatement or in avoidance, that go behind the record, are not authorised by the common law, but only by statute, and that there is no such statute in force in the State of Alabama; and lastly, that the statute of 1826, where its provisions have been complied with, is conclusive as to the character of grand jurors, the question is submitted on the part of the state.

The Attorney General (Martin,) argued this case

fully on the part of the state, but as the numerous duties of this gentleman did not permit him to draw out his argument, and as the Reporter could not do justice to it by reference to his own notes, it is unavoidably omitted.

By Mr. Chief-Justice SAFFOLD :

The prisoner, Boyington, was indicted in the Circuit Court of Mobile county, for the crime of murder, alleged to have been committed on the body of one Nathaniel Frost. After the indictment had been found against the prisoner, charging him by the name of Charles Boyington, he pleaded in abatement that he was known and called by the name of Charles R. S. Boyington, which was his proper name, and not that of Charles Boyington, &c. To this plea the *Solicitor* filed a replication, taking issue thereon.

This issue, on the 15th day of November, 1834, (being a day of the term of the Court,) was submitted to the jury, who returned a verdict against the prisoner that his plea was untrue.

Two days thereafter, the prisoner filed his two other pleas in abatement.

1. That George Davis, jr. one of the grand jury that found the indictment against him, was not a citizen of the United States of America, or of any one of the same, but a subject of the Kingdom of Great Britain and Ireland, and had never been naturalised.

2. That one C. Waldo, another member of the same grand jury, previous to his being elected and sworn, had formed and expressed an opinion respecting the prisoner's guilt or innocence, by saying, if he should be on the jury to try him, he would hang him.

These two latter pleas, on motion of the Solicitor, were, by the Court, stricken out, as being illegal and

insufficient, and a *respondeat ouster* was awarded. After which, on the 20th of the same month, the prisoner having been arraigned, pleaded *not guilty ;* whereupon a trial was had before a petit jury, who returned a verdict of *guilty* : on which, judgment was pronounced.

At the trial, however, the presiding Judge reserved for the consideration of this Court, as novel and difficult, the question, whether or not there was error in the decision of the Court, ordering the two pleas, as stated, to be stricken out.

This, alone, is the question presented for the consideration and decision of this Court.

No objection is made to the sufficiency or regularity of the record, other than as mentioned. The grand jury appear to have been selected by the agency, and under the inspection of the judge of the county court, and commissioners of roads and revenue, together with the clerk and sheriff, in the mode prescribed by the statute ; and the indictment purports to have been found by sixteen " good and lawful men of said county, impanelled, sworn and charged," &c.

Whether the plea in abatement, on the ground of the alleged *misnomer*, (in as much as it related alone to the initials of the middle name, affecting neither the *christian* or *sir name* of the prisoner) presented a material issue ? and whether, if considered *material* or *immaterial*, the fact of its having been pleaded, and found against the prisoner, could affect his right to the benefit of any subsequent plea in *abatement*, is a question which, under the views we have taken of the other points in the case, is unnecessary to be examined in arriving at a decision of it.

In reference to the question reserved, I consider it a well established principle of the common law, that grand, as well as petit jurors, must be *probi et legales*

16

*homines* : therefore, it is a good exception to one *re-turned* on a grand jury, that he was an *alien*, or *villien*, or that he was *outlawed* of a crime, or that he was returned by the proper officer, or that he was returned at the instance of the prosecutor; *but it is said these exceptions must be taken before indictment found.*"[a]

<div style="margin-left:2em">[a]Bacon's Abr. Juries A.</div>

By the statutes of this state, these disqualifications are not expressed; it is only provided that, "No person under the age of twenty one years, or above the age of sixty, nor any person continually sick, or who may be diseased at the time of the summons, nor any person who has been convicted of any felony, perjury, forgery, cheat, or conspiracy, or offence; (*crimen falsi*,) shall be summoned on a jury."[b] Yet, I would not hesitate to recognise the common law disqualifications as being in force with us, so far as they are known to our law, and the same reasons can apply in all cases, where taken in due time and in proper form.

<div style="margin-left:2em">[b]Aik. Dig.295.</div>

But, it is necessary to observe, that as early as the 11th year of the reign of Henry IV, an English statute was passed, reciting in the preamble, that extensive injustice and oppression had arisen to the lawful liege people of the King, from inquests taken at *Westminster*, by persons named to the justices, without due return of the sheriff; of which persons, some were outlawed, and others had fled for refuge to sanctuary for treason and felony; therefore, it was declared, for the ease and quiet of the people, that indictments so found should be revoked, annulled and for nothing held; and that thereafter, no indictments should be made, but by the King's lawful liege people, duly summoned by the proper officer; and that any indictment otherwise found, should also "be void, revoked, and forever holden for none."[c]

<div style="margin-left:2em">[c]Bacon's Abr. Juries A.</div>

The finding of an indictment gives to it the dignity of a record; and it is a general principal of the common law, that no plea shall be admitted, to impugn the verity of a record; yet, that such plea may be authorised by statute, none will question; and it appears that the statute referred to, had this effect. Under its authority, the Courts of England decided, that any person arraigned on an indictment, taken contrary to the statute, might plead such matter in avoidance of the statute, and also plead over to. the felony."[a]

[a]Hawk. book 2 ch. 25, § 33.—Bac. Abr. Juries A.—1 Ch. Cr. Law, 252.

At a subsequent period in the 3d of Henry VIII, another act of Parliament passed, directing that all panels of grand jurors to be returned by the sheriffs and their ministers before the justices of jail delivery, or justices of the peace, whereof one to be of the quorum, in their open sessions, should be *reformed* by putting to and taking out of the names of the persons so impanelled, by the discretion of the justices, and that they should command the sheriffs to put other persons in the same panel, and *when so reformed should be " good and lawful."*[b]

[b]Idem.

The English judicial decisions have farther ruled, that this latter statute does not take away the force of that of 11 Henry IV, except so far as they are repugnant; and therefore, if any indictor be outlawed, or returned at the nomination of any person, contrary to the statute of 11 Henry IV, *except of the justices, under their authority to reform the panel as aforesaid,* the indictment may be avoided by plea, as in the former case.[c]

[c]Bacon's Abr.

Since the statute referred to, of Henry IV, pleas in avoidance of indictments, for objections to particular jurors, principally on the ground of outlawry, have, in many instances, been allowed in England; yet, much difficulty has also been felt and expressed,

on the question whether such objections can be plead-
ed in abatement; or according to a different phrase-
ology, in avoidance of the indictment. Previous to
that statute, there seems to have been no instance of it.

An eminent Jurist remarks on this subject, "that
it was resolved in the Year Book of 11 Henry IV,
by the advice of all the justices, that one outlawed on
an indictment of felony, may plead in abatement of
it, that one of the indictors was outlawed for felony,
&c. But it seems to be the better opinion, that this
resolution is rather grounded on the statute of 11 Hen-
ry IV, which was made in the same term in which
this resolution was given, than on the Common Law;
because it appears by the very same Year Book, that
when this plea was first proposed, it was *disallowed :*
from which, I suppose it is collected, that the subse-
quent resolution was founded on the authority of said
statute, which may be intended to have been made
after the plea was disallowed, and before the subse-
quent resolution, by which it was adjudged good.
Yet, considering that the said resolution was given
in the beginning of Hilary term, and that the Parlia-
ment that made the statute was not holden before the
beginning of the same term, and therefore, it is not
likely the statute was so soon made ; and also, consi-
dering that the said resolution was given by the ad-
vice of all the Judges, who seem to have been con-
sulted about the validity of the plea above mentioned,
at the Common Law, and takes no manner of notice
of any statute, but only of the law in general, it may
deserve a question, whether such plea be not good at
Common Law."[a]

I have thus quoted the section at length, because I
discover the question there suggested, has been uni-
formly referred to as the authority for such pleas in
abatement, and has been the source of much doubt

[a] 4 Hawkins, book 2, ch. 25, § 18.

and speculation in that country, and this, ever since. The difficulty has been to determine, whether any right to plead in avoidance of an indictment for the incompetency of particular jurors existed at Common Law, or whether it had its origin in the statute of 4th Henry, and consequently can exist only within that Kingdom and its dependencies.

As I have already shewn, the principle maintained by *Bacon*, is, that the right in England, so far as it exists, was derived from the statute, and that, at Common Law, the exception can only be taken by challenge to the juror before indictment found. The principle is clearly recognised, by all who have treated of the subject, that it is the duty of the Court, if informed of any legal objection to a person about to be sworn on the grand jury, to exclude him ; also, it is the acknowledged privilege of all persons present, of those anticipating prosecutions, or others, as the friends of the Court, to point out the objection, and cause the exclusion of the juror.

*Chitty*[a] remarks, that, if a man who lies under any legal disqualification, be returned on the grand jury, [a] Crim. L. 1 v. 307, ch. 6. he may be challenged by the prisoner before the bill is presented ; or if it be discovered after the finding, the defendant may plead it in avoidance, and answer over to the felony. That this necessity for the grand inquest to consist of men free from all objections, existed at Common Law, and was affirmed by the statute of 11 Henry IV, "which enacted, that any indictment taken by a jury, one of whom is unqualified, shall be altogether void, and of no effect whatsoever ;" also, he says, "that a defendant before issue joined may plead the objection in avoidance ; but if he take no such exception before his trial, it seems doubtful how far he can afterwards take advantage of it," &c. It however appears from his references, that he re-

lies for his position respecting the right to plead in avoidance, on the authority of the Year Book, and expressions of *Hawkins*, together with some adjudications under the statute of England, to which I have referred, and which sustain him only so far as has been shewn.

It also, appears, that on the trial of the *Shearers*, in Ireland, in which the right claimed in this case, was brought in question, (but a decision of which was not considered necessary in disposing of that case,) that Court did not consider the right to plead this matter in abatement, as having been established. Lord *Carleton*, in expressing the opinion of the Court, uses this language: "*That* a person being an *alien* is a good cause of challenge, I think is well founded, but whether it can be taken advantage of by way of plea, I reserve my opinion." Again, he says, "that a juror is *outlawed* may be taken advantage of by plea of avoidance of the indictment, but whether such plea is given by the Common Law, or depends on the statute of 11 Henry IV, is a question of some difficulty; that it was passed about the same time with the case mentioned by *Hawkins*." He further said, that "From a manuscript note which he had made in the margin of his *Hawkins*, he perceived the statute received the royal assent in *quindina Hillarii*, which was on the 27th or 28th of January, and might, perhaps, have preceded the decision referred to by *Hawkins*."

It appears, from a review of the authorities so far, that the existence of this right, at Common Law, is at most, very doubtful; but that even if the principle was conceded, this right was allowed while the law of England confided to the sheriff and his ministers, the absolute and exclusive power and duty of nominating and returning on the panel of the jury such persons

as they chose to select, and when it had become usual for outlaws, traitors, and felons, through the contrivance or inadvertence of these officers, to foist themselves into the panels to effect oppression, or otherwise pervert justice;—that, to prevent these evils, the justices resolved, (Parliament enacting a similar provision about the same time,) that such objections should be available by plea in abatement. If it remain doubtful whether the resolution, or the statute preceded, such as I have described were the evils to be guarded against, a necessity which has no existence under our law. Our panels, as we have seen, are subjected to a more effectual scrutiny than those in England, as prescribed by the statute of 3 Henry VIII, and which we have also seen had, in the opinion of the English Judges, the effect to supercede the necessity of, and exclude the right to plead this matter in avoidance.

To shew more definitely the manner in which our juries are scrutinized and selected, reference may be had to the statute,[a] where it is provided, that, on each return of the sheriff to the clerk of the Circuit Court, [a]Aik. Dig.298. of a list of the freeholders and house-holders within the county, the judge of the county court, with the commissioners, clerk and sheriff as aforesaid, shall, on a day appointed for the purpose, assemble at the court house of the county, and select from such list, such persons as they or a majority of them may deem qualified to serve on juries, and the names of the persons so selected, shall be put into a box to be kept by the clerk for that purpose; and the persons thus *selected shall be liable to serve on juries;* and shall be further chosen by lot, in the manner prescribed by a previous statute.

It is true, that the English statute referred to, of Henry IV, did not express the right to plead matters

of this kind in avoidance; it virtually secured the right, by declaring all indictments otherwise found, *null and void*, and to be for nothing held. It is equally true, that the subsequent statute of Henry VIII, did not expressly inhibit this right of pleading, yet it denied it by sufficient implication, when it declared that the panel *reformed* as therein directed, should be "*good and lawful.*" Both these points of construction have also been well established by the uniform current of English decisions. *Hawkins*[a] also maintains these positions in nearly the same language already quoted from *Bacon.* He says, "It hath been resolved, that the statute of 3 Henry VIII, doth not take away the force of the above recited statute of 11 Henry IV, in any point wherein it doth not expressly vary from it; from whence it follows, that if any of the jurors who find an indictment be outlawed, or returned by a sheriff or bailiff, at the nomination of any other person, the indictment may be avoided in the same manner as before, by force of the 11th Henry IV; except such nomination be made by the Justices, authorised, by 3d Henry VIII, to reform that panel."

[a] Hawk. book 2, ch. 25, s. 33.

From this declaration (the latter clause particularly) the conclusion obviously results, that such jurors as had been approved of and nominated by the justices should be considered, in the language of the statute, "good and lawful men," so far at least, as to make their indictments valid and conclusive, if objection were not made before they were found. Then the farther conclusion appears to me to be equally irresistible, that as our mode of selecting the jury is better guarded, our lists of jurors being subjected to a closer examination and purgation, than can be expected from the English mode of *reforming* theirs—on principle and authority, the right of pleading to the personal disqualifications of particular jurors, who

have been selected pursuant to the statute, must be denied.

These views of the case are no less applicable to the 3d plea in abatement.

The matter of this plea—the formation and expression of a previous opinion by the juror against the prisoner, must rest on the same or a less valid ground of objection. As respects the difference, it is, on this occasion, only necessary to remark, that the expressions imputed to the juror Waldo, might not be considered conclusive of his incompetency. Had an examination been had on challenge of the juror, or in any other proper manner, it might have been found that the expression of the juror was intended, and understood only as a matter of levity or jest, or that the juror was prompted to it by mere rumor, and had either retracted the expression, or was ready to do so ; that he had no knowledge or satisfactory information of the facts—no enmity or prejudice against the prisoner, and that he felt his mind perfectly open to conviction upon legal evidence.

But, without pursuing this point farther, I proceed to a further notice of the right, in general, to plead in abatement, the incompetency of particular grand jurors.

Questions of this kind, appear to have been of very rare occurrence in the United States. But, in the case of The Commonwealth vs. Smith,[a]—the defendant [a] 9 Mass. Rep. 107. having been indicted for usury, pleaded in abatement, that one of the grand jury, Thomas Wing, being of the denomination of Quakers, did not take the legal oath as grand juror. It appears from the replication and demurrer thereto, that the juror being scrupulous of taking judicial oaths, had only affirmed.

Sewall, Judge, in delivering the opinion of the Court, said, " Whether an exception of this kind is

17

to be received at this stage of the proceedings, is a question which seems not to have been finally determined." He further remarked, that "Indictments not found by twelve good and lawful men, at the least, are void and erroneous at Common Law; and the circumstance that it was found by twelve men is stated in the caption of every indictment, according to the English forms and practice. But this formality has not been observed with us: and the omission is not to be objected to in indictments found according to our practice, viz: "The grand jurors of the Commonwealth on their oaths present," &c. An irregularity in this respect, if it should happen, might become a subject of enquiry upon suggestion to the Court; for, under their superintendence the grand jury is constituted, and must be understood to have the legal number of men. This being the construction to be given to the record, after an indictment has been received and filed by the Court, no averment to the contrary can be admitted as a *formal plea*. Objections to the personal qualifications of the jurors, or to the legality of the returns, are to be made before the indictment is found; and may be received from any person who is under a presentment for any crime whatever; or from any person present, who may make the suggestion as *amicus curiæ*." But Quakers (as was held by that Court,) are capable of serving as grand jurors, and the affirmation by them, under the various statutes, was considered sufficient.

In *U. States* vs. *Coolidge*,[a] after the indictment had been found, it was discovered that the grand jury had received testimony of a person not under oath, and this satisfactorily appearing to the Court, by affidavits, the Court, on motion of the prisoners' counsel, *quashed* the indictment, as having been irregularly found. It was there also ruled, that one not being

[a] 2 Gallison, 364.

of the religious sect, usually called *Quakers*, though having consciencious scruples against taking an oath, could not give evidence on *affirmation*, but would be committed until he consent to take the usual oath.

In reference to the case last reviewed, it will be observed, that it furnishes no principles inconsistent with those previously advanced; it does not question the competency of any member of the grand jury, or sanction the plea in abatement for any such exception. The Court only proceed, in a manner analagous to setting aside verdicts of petit juries, to quash or avoid an indictment for the improper or illegal conduct of the grand jury in finding it, not upon evidence of sworn witnesses, but upon declarations without the sanction of an oath. This would, doubtless, have been a sufficient ground for a new trial after verdict, if not sooner discovered.

Other cases have occurred in Massachusetts, on which the prisoners' counsel place more reliance. In *Commonwealth* vs. *Parker & al.*[a]—after a conviction was had for murder, a motion was made in arrest of judgment, on the ground that J. Wythe, one of the grand jury, was not properly on the grand inquest, because the return of the *venire* for the town of his residence, was not signed by any officer: whereupon, the Court permitted the constable, whose duty it was, and who had neglected it, (he being present, and still in office) to amend the return, by signing it—then considered the matter.

[a] 2 Pickering, 550.

The prisoners' counsel relied upon the doctrine of *Hawkins*, in reference to the statute of 11 Henry IV, which I have already quoted: also, on a case of *The Commonwealth* vs. *Davis* in MS. drawn up by *Dana*, and certified by the Chief Justice of the Common Pleas, who was of counsel in the case. The facts of this latter case appeared to be, that Davis was con-

victed, in 1794, of *burglary*, and after verdict, it was discovered that one Locke, who served on the grand inquest had not been chosen as a member, but that the name of one Burr, who had been chosen, had been erased from the return of the *venire*, and Lock's name inserted in its place. Upon a motion in arrest of judgment, it was contended, on the part of the government, that as there were seventeen jurors besides Lock, the indictment was good; to which it was answered, and so considered by the Court, that there might have been only eleven without him, who agreed to the bill, and that the judgment was therefore arrested.

The Court, in deciding the case of *Parker et al.* on the objection to Wythe as a juror, observed, that the precedents in which such an objection has prevailed, have generally been, cases where the juror was not qualified to serve. Then, noticing the statute of Henry IV, and *Hawkins'* reference to it, the Court proceeds to say, " The mischief was, that persons were put on the jury who were not qualified to serve—they were outlawed, &c. and had no right to be on the jury. The case referred to, of *The Commonwealth* vs. *Davis*, proceeds on this same principle," &c. But, " the present case is very different. Here, there was no objection to the qualifications of the juror. He was entitled to be drawn as a grand juror, and he was drawn, and had notice and attended, and was sworn and allowed to act with the grand jury." This opinion further remarks—" It is objected, that there is a difference between traverse jurors and grand jurors, because traverse jurors may be challenged. The books say, that grand jurors may also be challenged. But, there is a difficulty in the case, for a bill may be found against a person who has not been recognised, and who has no opportunity to challenge.

The case of *The Commonwealth* v. *Smith*—if we should adopt the remarks there made on this subject, to their full extent, would put an end to this motion in arrest," &c. In as much, however, as the doctrine of *Smith's* case, on this point, was not necessary to be applied, and the case in which it was expressed, was determined on another point; and because the Court had some doubts of its correctness in all cases, they decided *Parker's* case on the ground that Wythe was properly qualified to serve on the grand jury ; and that the constable was properly allowed to amend his return.

It may be remarked, with respect to the case of *Davis*, (admitting it to be correctly reported,) that it, in no degree, conflicts with the principles I have maintained. *Lock*, whose name was foisted into the return, having never been chosen on the grand jury, surely could not, in fact, or legal contemplation, have the slightest claim to the character of a good and lawful juror, but the return of the *venire*, in reference to him, had been grossly falsified, and of course vitiated.

*Parker's* case is entitled to little, if any more, consideration. The juror's authority to serve, was deemed sufficient, on objection merely, that he, did not appear from the *venire*, to have been summoned. It is true the Court intimated, a doubt of the correctness of the remarks in *Smith's* case, but decided nothing in reference to this question ; nor do they appear to have investigated the subject, to have considered the effect of the English statutes, to which I have referred, or the influence due to statutory *reformations* or *purgations* of jury panels, such as provided in England, or in this or any other State of the Union. I consider the law sufficiently settled to exclude the right to except to the personal qualifications of the persons selected, summoned and sworn on the grand jury, as prescribed by statute, after indictment found, and to

9 Mass. Rep. 107.

bind us so to declare it, whether we approve of the
policy or not. But, to examine the question on prin-
ciple, the impolicy of allowing the pleas in question,
appears to me obvious. It must be conceded, that if
the right exists, it must apply in all cases, as well for
misdemeanors and inferior felonies, as for capital
crimes. If a knowledge of the intended prosecution,
by the accused, or his presence in Court, be held ne-
cessary to exclude the right, as contended in argu-
ment, this is more common and more generally to be
expected in capital crimes than in charges for infe-
rior offences. If *alienage* furnishes a ground for avoid-
ing an indictment, it would seem that want of age,
want of house-hold or free-hold, must do the same ;
then various other disqualifications must stand on the
same principle, requiring the trial of distinct issues
on evidence, the necessity of which could not be an-
ticipated. The same consequences must result from
various grounds of exemptions from serving on juries,
or the latter must be distinguished from the former,
and in some cases the distinction would involve much
difficulty. But the consideration, that want of the
strict legal qualifications in one or more of the grand
jury, has no necessary tendency to prejudice the ac-
cused ; that it can create no presumption that one
expecting to be indicted, would choose to exclude
such person from the jury, if present with the know-
ledge of the objection, inclines me strongly against the
policy of allowing such defence. I would cheerfully
submit to all the delay and embarrassment, that
could arise from such a course of practice, if demand-
ed by motives of true humanity or justice. Our ju-
ries being selected by, and in the presence of the se-
veral sworn officers of the county, as already shewn—
all presumed impartial, and intended to pass on all
bills preferred during the term of the Court, there can

scarcely be a motive or danger of oppression. The objections, generally, that would be available in one case, would be the same in all : many indictments may be found by a panel, containing, among others unexceptionable, one or two men wanting the requisite qualifications; most or all the persons indicted, may have known this, or have had every opportunity to know it—all remain indifferent or silent : afterwards, perhaps at a subsequent term, after the statute of limitations has barred the commencement of new prosecutions, (in cases subject to limitation) one concludes he can derive some advantage (delay at least) by abating the indictment against himself—he succeeds—others follow the example, and every indictment is quashed, on a ground that could do injustice to no one, and would never have been claimed, but with a hope to delay or defeat the objects of the law. If finding an indictment could operate as a *conviction,* I would be more disposed to demand of the Court and its officers, all vigilance in scrutinizing the jury, and none from the accused : but, in as much as indictments, when found, are but legal *accusations,* intended to shield individuals from frivolous or malicious prosecutions, and to subject them to trial, only on strong presumption of guilt—as, afterwards, they are secured in the right to an impartial public trial before the Court, and by a jury strictly scrutinised—entitled to be confronted by the witnesses against them, with the full benefit of all witnesses in their favor, and of counsel in their defence—I cannot apprehend danger of oppression from grand juries, constituted as ours are required to be.

The admitted privilege of any and all persons, to challenge incompetent jurors, at any time before indictment found, is sufficient to prevent all material abuses of this kind. If, however, the indictment be

*2 Gallison, 354.* not predicated on *evidence*, as in *Coolidge's*[a] case ; or, if it be falsified by a change of the selected jurors, or the fraudulent insertion in the return of the *venire*, of an improper name, as in *Davis's*[b] case, then the question is essentially different : it is not an *indict-* *ment* as prescribed by law, and of course should be subject to avoidance on plea, or motion properly sustained.

*b Dana's MS. See page 131 of this volume.*

It would certainly involve great inconsistency, to maintain, that the circumstance of a grand juror having been an *alien*, should be adjudged sufficient to avoid an indictment after found, when, if one equally objectionable, serve on a petit jury, which returns a final conviction in either a civil or criminal case, (the fact being unknown until after the trial,) the verdict can not, for this cause, be disturbed. The latter, I understand to be the true principle in either case ; that such objection can only be made by challenging the juror before the trial.—(See *Hollingsworth* vs. *Duane.*[c])

*c 4 Dallas 352.*

Notwithstanding we have neither the information of facts in evidence, or any legal authority to investigate the *guilt* or *innocence* of the prisoner ; but only to determine the isolated questions of law, reserved by the record for our revision, it is ever extremely painful to decide against the accused, on a question *vitally* affecting him ; but Judges can exercise no mercy or discretion, beyond their opinion of the law.

In the opinion of a majority of the Court, the *judgment must be affirmed.*

By Mr. Justice THORNTON.

The question which has been referred to this Court, by the Judge who tried the prisoner, is simply this : can he, after the indictment has been found, returned into Court, accepted and filed, plead in bar, or

avoidance of that indictment, that one or more, of the grand inquest of the county, who preferred it, is an alien, or labors under any other, of the various disqualifying objections, which affect the competency of a grand juror. I think he can not, either upon principle or precedent.

The first case in which we find any attempt was made to plead such matter, is referred to by *Hawkins*,[a] as in the Year Book of 11th Henry IV, when it was disallowed ; and that author says, it is the better opinion, that those decisions, after that referred to, in which such plea was allowed, were made under the statute of Henry IV, which expressly declared the indictment thus found to be null and void, and of no effect. The argument to sustain the plea of such matter, is, that upon common law principles, alienage, &c. disqualifies a juror. Now, this is equally true of the alien, &c. whether he be a grand juror, or a petit juror ; and if the finding of a bill by such an one makes the indictment void, by parity of reason, the finding of a verdict by such an one, would also be null and void. Yet it is well settled, that in such case, the verdict can not for that cause, be impugned. The principle which governs in both instances in this country, where we have no statute like 11th Henry IV, is, that the tribunal to decide on the matter must be challenged before it performs the function, for which it was constituted. The office of a grand jury is to prefer the charge, and that of the petit jury is to try it. After the action of either is completed, their competency to act, is not questionable. The action of the grand jury terminates with the filing of the bill—that of the petit jury, with the rendition of the verdict. So far as the safety of the citizen is involved, it cannot be pretended, that it is less important to overhaul the verdict, than

[a] Book 2, c. 25, sec. 18.

18

to set aside the finding of the indictment : for the latter only prefers an accusation, whilst upon the other, depend emphatically, the issues of life and death. The only reason for any distinction in the two cases, which can be urged with any degree of plausibility, is, that in the case of the petit jury, the party has a *better* opportunity of challenging, than in the other. In both cases, all the books agree, that there is a full and fair opportunity to do so, which was practically illustrated in the trial of Burr. The interest which is felt in the case of the grand jury, is not commonly so incentive as to induce its exercise, and hence it is rarely done : but that does not vary the essential nature of the case. This principle, which relates only to the *competency* of the body, whether grand, or petit jury, should not be confounded with another, which relates to the *competency* of the *testimony*, upon which the action of the body is founded. In the latter case, the doctrine is, that where the evidence is incompetent, the action had upon it, is a nullity, and may be availed in the appropriate mode peculiar to each. In the case of a verdict found, by a motion for a new trial addressed to the Court, and in case of indictment returned a true bill, by appealing to the same tribunal, either by motion, or by plea, according to the practice of the Court.

The decision of this Court, now pronounced, adverse to the allowance of the pleas of alienage, &c. after indictment filed, I apprehend to be, the doctrine of the common law, which, both in civil and criminal matters, is in full force in this state, so far as not incompatible with the genius of our political institutions, unless altered by statutory enactment of our own legislature. The application of the principle, is, I think, entirely obligatory upon us, and if it be unwholesome, which I am far from conceding, the ap-

propriate remedy is to be applied by another department of the government. I would venture to predict, that a statute conferring the benefit of pleas, of the character refused in the Court below, upon prisoners; whilst the correct organization of our grand jury, is secured by so many guards, as our present laws afford, would result rather in the obstruction of condign punishment, than in the protection of persecuted innocence.

I concur in the affirmance of the judgment, with the *Chief Justice.*

Mr. Justice HITCHCOCK, dissented.

I am not able to concur in the opinions just delivered. I think the plea of alienage should have been allowed, and that too, notwithstanding the plea of *misnomer.*

That plea should not, I think, have been received. It is not a good plea at Common Law, in a case of felony; because the proceeding in such case is against the person of the prisoner, by whatever name he may be distinguished.[a] We have no statute, as in England, allowing it, and a middle name, or the initials of one, cannot be pleaded in abatement, even in a civil case.[b] This being the case, I would not, in a capital case, deprive the party of a second legitimate plea in abatement, though the first immaterial one had been allowed by the Court below, and had been found against him.

By our statute, a "grand jury of a competent number of *good and lawful men,* of the county where the Court is held, shall be returned and empannelled agreeably to law, to attend each term of the Circuit Court."[c] By the Common Law, these "good and lawful men," must be citizens: they must not be "aliens, villeins, outlaws, either in criminal or perso-

*Margin notes:* [a] 3 Bacon's In. G. 2. [b] 5 Johns. 84. [c] Aik. Dig. 243.

nal actions ; persons attainted of treason or felony ;
or persons convicted of any species of *crimen falsi*,
as conspiracy, or perjury, which may render them
infamous,[a] and any person returned on a jury obnoxi-
ous to any one of these objections, may and will, at
the suggestion of any person, before bill found, be re-
jected.[b]

This right, so far, it is admitted, exists at Com-
mon Law, and *Chitty*[c] says, it may also be done af-
ter bill found, by plea in avoidance ; and he refers to
*Hawkins*,[d] who states, that it is doubtful whether this
right exists at Common Law or by the statute of 11
Henry IV, chap. 9. He refers also to *Bacon, Juries A.*
But, he says, *the exceptions must be taken before in-
dictment found.*

This statute, after reciting that inquests had been
taken at *Westminster*, by persons not returned by the
sheriff ; by persons outlawed ; by persons who had
fled to sanctuary for treason and felony, declares that
all such indictments so made shall be null and void,
and for nothing held. This statute does not embrace
aliens, and no case can be found in England, where
the question has been made. It could not, of course,
arise on any one of the other qualifications since the
statute, and we are left to decide the question, more
upon principle than authority.

The case of the *Shearers*, alluded to, shews, that
the Judge there had his doubts, as well as *Hawkins.*
The only case to be found, of a decided opinion, is that in
9 *Mass. R.* This was a *dictum* of Justice *Sewall*, and
the reason, to wit, that to allow the plea would con-
tradict the averment in the indictment, that " *the ju-
rors were good and lawful men*," does not seem to be
entitled to much weight. Its correctness was ques-
tioned by the Court in a case in 2d *Pickering.*

In England, by the statute of the 3d Henry VIII,

a 1 Chitty's Cr. Law, 207.—3 Bacon's, Abr. 725.

b 3 Bac. Abr. 725.

c 1 Cr. L. 207.

d Hawk.book 2 ch. 25, § 18.

the justices reform the panel returned by the sheriff, by putting off such as are disqualified, and adding others in their place.  It has, however, been decided, that this act does not repeal the act of the 11th Henry IV, where it does not conflict with it, and therefore, an indictment found by an outlaw, or person returned at the instance of any person, (except of the justices) may still be abated on plea as before the statute : neither statute authorises the plea; it is allowed to carry into effect the provisions of the statute which declares the indictment void.

It is true, our laws regulating the formation, and selection of juries, is more guarded than in England. It requires, every two years, a list of free-holders and house-holders to be returned by the sheriff to the circuit court clerk, which are placed in a box, and the panel is drawn from this box by the sheriff and clerk, and if it appear that a person, whose name is drawn, has removed from the county, or is deceased, his name shall not be included in the panel, but no other power is given to reform the panel : aliens and felons may be there, and may be returned.  In this particular, the power does not extend as far as it does in England.

Is our law then, so guarded that no objections ought to be allowed after bill found ?  If, indeed, the presumption is, that the law has taken sufficient care of the interests of those who may be indicted, (and every man in the community is liable to be,) why is an exception to be allowed before bill found ?  Yet it is clear, that any one of the objections known to the Common Law, may be made by any person as *amicus curiæ*, before bill found, and the person objected to will be discharged.

If the plea is not allowed, this consequence follows, that a person, before bill found, may, upon sugges-

tion, purge the jury, as long as he can find upon it persons disqualified; but after he is indicted, even though it be for a capital offence, he can alledge nothing against the panel, though every person on it may be, in fact, disqualified. Does this seem reasonable or just,

In England, by statute, a person who procures himself put upon a jury, or who has been put on at the request of another person, will make the bill void, though he may be qualified in other respects, and though there may have been a competent number of persons beside him on the jury, who were qualified, and who concurred in finding the bill.[a] Is not the principle of the objection, to be found in the Common Law, and does it not exist properly then, without the statute.

<span style="float:left">a 3 Bacon's Ab. 727.</span>

The distinction taken, as to the time when an exception can be made, precluding it after an *action* by the grand jury, and the analogy which is attempted to be drawn between this case, and that of exceptions to the petit jury, which are not allowed after verdict, does not hold. The analogy fails when the reason fails. In the case of the grand jury, the defendant has never been called to except, until bill found. In the case of the petit jury, he has had his day for objection and selection. There must be an end to the prosecution; and when the party has had his day of objection, he must submit.

The true and safest rule, to my mind, is this, that when a bill has been found by persons who, by the *Common Law, are disqualified*, it should be held void upon plea, and the defendant should not be held to answer an indictment proceeding from so vicious a source. By adopting the other rule, the act is made to sanctify the means, and the party looses his right to object, for not having done so before he

had a motive, and on being arrested, though he can shew that the accusation has proceeded from aliens, felons, and persons packed upon the jury by fraud, he is told that he is too late—the accusation has purified the accusers, and he cannot be heard.

Even in a civil proceeding, a person is permitted to except to the illegality of a proceeding, until he waives the right; much more then should this right be held sacred in a criminal case, where it is said a man cannot waive his rights.

But, public policy and convenience, it is said, forbid this proceeding. What principle of public policy can be more sacred than that the sources of justice should be pure? and wherein is the inconvenience greater after bill found, than before? A bill is found to-day—the defendant is put upon his trial to-morrow—he can alledge nothing against the grand jury, when the next entry on the minutes may be an order discharging the same jury, at the suggestion of any idle bye-stander who may chance to come into Court, and against whom no charge is made. Ought not the Court rather to say, that indictments found by persons not "good and lawful men," shall be "revoked, annulled, void, and holden for none forever." If I am to be put on trial for my life, let my accusers, at least, be *boni et legales homines.*

The want of authorities in favor of the plea, is suggested as an argument against it. I infer the opposite. There are cases so plain, that precedents can not be found shewing their having been contested. The point could not be made in an appellate Court, unless, as in this case, the plea was denied. It is hardly possible that a case never occurred, but it is possible—may be quite probable, that the plea was never before denied.

Indictments have been quashed, and *nolle prose-*

*qui's* have been entered for irregularities, much less than this.

In 2d *Mason,* Judge *Story* quashed an indictment because it appeared on *trial,* that a man had given evidence before a grand jury, who had (though not a Quaker,) been affirmed, he having conscientious scruples against taking an oath.

In 2d *Pickering,* a bill was quashed, because found by a person, one of the grand jury, who had been substituted for one of the regular panel, as a matter of convenience to the regular juror ; and I presume hundreds of cases have occurred where the prosecuting officers have entered *nolle prosequi's,* on suggestions of irregularities, not even affecting the jury. Hence the want of decided cases to avail us in the investigation. The inconvenience is trifling—it is preferred even in pleas of *misnomer.* A new bill can be found. If necessary, the jury can be reformed, and the proceedings can be had without a suggestion of a defect.

By this course, and by always listening to any suggestions which will shew, that the grand jury must always be not only pure, but above suspicion, you remove the temptation to corruption, and keep it, what it was always intended to be, the grand inquest of the county, composed of " good and lawful men—as ready to reject unfounded charges, affecting the life, liberty, and character of the citizen, as it will be to detect crime, whenever it exists. Let the sources from whence justice emanate, be always pure, and the law can look crime in the face, and punish it without a blush. I cannot imagine, that a rule which, for all practical purposes, has been exploded in England, since the time of Henry IV, and when it is doubtful whether it ever existed at the Common Law, is fit to be applied under the liberal and enlightened policy of the present age.